RENDERED: FEBRUARY 7, 2025; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2023-CA-1254-MR

R.L.P.[1]                                                                    APPELLANT

                          APPEAL FROM WARREN CIRCUIT COURT
v.                       HONORABLE JOHN R. GRISE, JUDGE
                          ACTION NO. 23-H-00427-001

COMMONWEALTH OF KENTUCKY                                  APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, COMBS, AND A. JONES, JUDGES.

JONES, A., JUDGE: R.L.P. appeals from the trial court's order of involuntary and

indefinite commitment at the Kentucky Correctional Psychiatric Center (KCPC)

pursuant to KRS[2] Chapter 202C. R.L.P., through counsel, now challenges his

involuntary commitment on the grounds that KRS Chapter 202C is

---

[1] The trial court entered a confidentiality order in this case on October 19, 2023. Accordingly, to maintain this confidentiality, we use the initials of the respondent/appellant in this Opinion.

[2] Kentucky Revised Statutes.

unconstitutional. He also asserts that the trial court improperly permitted the Commonwealth's experts to testify based on hearsay without proper foundation. After a thorough review of the facts and the law, we now hold KRS Chapter 202C to be constitutional, and we affirm the trial court's commitment order.

## I.    BACKGROUND

As of November 2021, R.L.P. lived with his father ("Father") and had done so for many years. It is undisputed that R.L.P. is a very sick man. A KCPC evaluation of R.L.P., performed in 2005, indicated that he had a long psychiatric history as a result of his acute schizophrenia, and this history included numerous psychiatric hospitalizations. R.L.P.'s speech is hurried and pressured, and he frequently conveys delusional beliefs. By way of example, the record reflects that R.L.P. has stated he was born "in the house of Hitler," that he came to the United States following "the Peace Treaty of 1974," that he was currently eleven years old, and that he suffered physical or sexual abuse at the hands of Al Qaeda. (Record ("R.") at 140.) When asked if he had ever received disability payments, he responded by stating, "Donald Trump took me to the social security office in 2017." (R. at 140.) He also evinced a belief that President Trump and Senator McConnell were going to send him back to primary school. (R. at 158.)

At some point in early November 2021, Father died as a result of a homicide in his home in Bowling Green. After R.L.P.'s brother reported Father

missing, police entered the home on December 8, 2021, and found the body. Father had suffered approximately forty-five stab wounds, and the state of the body was consistent with the death occurring about thirty days previously in the low temperature environment of the home. (R. at 110.) The state medical examiner assigned to the case later testified that the cause of death was "multiple sharp force injuries of the head, neck, torso, and extremities." The body was found covered with a blanket and a coat, with a pillow under his head, and a Bible and letters from R.L.P. had been placed under Father's hands.

R.L.P. himself was not at the home when Father's body was discovered because he had been found earlier, on November 12, 2021, on an abandoned property in Simpson County with a deep laceration on his right hand. After police arrested him for trespassing, R.L.P. was subsequently treated for the hand injury at the Simpson County Jail and at the Bowling Green Medical Center. During his treatment at the medical center, his delusions and manner of speaking caused the physician to refer him for a psychiatric evaluation. R.L.P. was then admitted to Western State Hospital, a psychiatric facility in Hopkinsville. On December 9, one day after Father's body was discovered, police interviewed R.L.P. at the facility. They arrested him for Father's murder after he said, "Daddy, I think I made you dead." (R. at 109.)

After an evaluation at KCPC, the medical director, Dr. Daniel Hackman, opined that R.L.P. was "not competent to stand trial," and "there was not a substantial probability that he could be restored to competency in the foreseeable future." (R. at 159-60.) After the trial court found R.L.P. to be incompetent to stand trial, the Commonwealth filed its petition under KRS Chapter 202C to have R.L.P. involuntarily and indefinitely committed.

On March 23, 2023, with proper notification to the Attorney General of Kentucky, R.L.P.'s counsel challenged the constitutionality of KRS Chapter 202C, which had been signed into law on April 1, 2021. (R. at 5-6.) As R.L.P.'s motion explained, prior to April 1, 2021, criminal defendants found incompetent to stand trial were subject to involuntary commitment under KRS Chapter 202A; however, KRS Chapter 202A contains a provision that a mentally ill person may only be "involuntarily hospitalized" if he or she "can reasonably benefit from treatment[.]" (R. at 6 (quoting KRS 202A.026(2))). This presented a perceived loophole in the statutes – when an incompetent criminal defendant **cannot** reasonably benefit from treatment, KRS Chapter 202A would not allow involuntary hospitalization. (R. at 6.) After an incident, unrelated to this case, in which an individual allegedly committed crimes after being released from a psychiatric hospital due to this inability to benefit from treatment, the General Assembly quickly enacted House Bill ("HB") 310 during the 2021 General

-4-

Legislative Session.  (R. at 7.)  This bill created KRS Chapter 202C, which allows indefinite involuntary commitment for individuals committing certain qualifying offenses:  capital offenses, Class A felonies, Class B felonies resulting in death or serious physical injury, first-degree rape, or first-degree sodomy.  KRS 202C.010(12).  The criteria for involuntary commitment are found in KRS 202C.050:

> (1) No respondent shall be involuntarily committed under this chapter unless there is a determination that:
>
>> (a) The respondent presents a danger to self or others as a result of his or her mental condition;
>>
>> (b) The respondent needs care, training, or treatment in order to mitigate or prevent substantial physical harm to self or others;
>>
>> (c) The respondent has a demonstrated history or recent manifestation of criminal behavior that has endangered or caused injury to others or has a substantial history of involuntary hospitalizations under KRS Chapter 202A or 202B prior to the commission of the charged crime; or
>>
>> (d) A less restrictive alternative mode of treatment would endanger the safety of the respondent or others.
>
> (2) When a respondent is involuntarily committed under this chapter, the cabinet shall place that respondent in a forensic psychiatric facility designated by the secretary.

The procedure outlined in KRS Chapter 202C consists of two key stages, an evidentiary hearing and a commitment hearing, during both of which the respondent has an assigned guardian *ad litem*, as well as a defense attorney. KRS 202C.020(1)-(2). During the initial evidentiary hearing, the trial court must determine, using a preponderance of the evidence, "whether sufficient evidence exists to support a finding that the respondent is guilty of the charged crime against him or her." KRS 202C.030(3). If the Commonwealth presents sufficient evidence at this evidentiary hearing, the trial court is then required to schedule a commitment hearing within twenty days. KRS 202C.030(5)(a). The trial court must also have the respondent examined by two mental health professionals, one of whom must be a physician, to determine if the respondent qualifies for involuntary commitment under KRS 202C.050. KRS 202C.030(5)(b).

During the subsequent commitment hearing, there are a significant number of procedural safeguards in place before the respondent can be committed. Under KRS 202C.040:

> (3) The Commonwealth's attorney's office serving the county of criminal prosecution which led to the finding that the respondent was incompetent to stand trial shall present evidence regarding whether the respondent meets the criteria for involuntary commitment under KRS 202C.050. The respondent and the respondent's guardian ad litem shall be afforded an opportunity to testify, to present evidence, and to cross-examine any witnesses.

(4) The manner of proceeding and the rules of evidence shall be the same as those in any criminal proceeding. The standard of proof shall be proof beyond a reasonable doubt. Proceedings shall be heard by the judge unless a party or the guardian ad litem requests a jury.

(5) The respondent's right to the commitment hearing shall not be waived.

Furthermore, the General Assembly mandated an extensive series of review hearings after commitment to determine whether involuntary commitment is still appropriate:

(a) From the initial order of commitment, a standard review hearing shall be conducted not sooner than ninety (90) days and not later than one hundred twenty (120) days;

(b) For the first two (2) years after the initial order of commitment, standard review hearings shall be conducted not less than one hundred eighty (180) days and not more than two hundred ten (210) days from the most recent review;

(c) Beginning two (2) years after the initial order of commitment, a standard review hearing shall be conducted not more than three hundred sixty-five (365) days from the most recent review hearing; and

(d) A heightened review hearing shall be conducted not more than five (5) years from the initial order of commitment and, thereafter, not more than five (5) years from the most recent heightened review hearing.

KRS 202C.060(2). "Standard" review hearings follow procedural safeguards functionally identical to those of the initial commitment in KRS 202C.040, and the

trial court must thereafter make written findings of fact as to whether the criteria for involuntary commitment continue to be satisfied based on proof beyond a reasonable doubt. KRS 202C.060(8). "Heightened" review hearings contain all the procedures of a standard review but additionally require the qualified mental health professionals who evaluated the respondent to give live testimony to the trial court and answer questions while the respondent is physically present. KRS 202C.060(9).

In his argument to the trial court, R.L.P. asserted the statute was unconstitutional on several grounds, asserting: (1) HB 310 violated Section 46 of the Kentucky Constitution for failing to be read on differing days in each House; (2) HB 310 violated Section 51 of the Kentucky Constitution because it related to more than one subject and the title of the bill did not accurately reflect its subject; and (3) KRS Chapter 202C failed to provide adequate due process protections for incompetent criminal defendants. After a hearing considering these arguments, the trial court denied the motion to hold HB 310 and the resulting KRS Chapter 202C unconstitutional in an order entered on August 11, 2023. (R. at 71.) The trial court held an evidentiary hearing on August 16, 2023, and determined by a preponderance of the evidence that R.L.P. was guilty of murdering Father. Afterward, the trial court held a commitment hearing in which R.L.P. waived his right to a jury. By agreement of the parties, the trial court heard testimony from

-8-

the mental health professionals, Dr. Lesch and Dr. Hackman, by means of Zoom video communication. Afterward, the trial court found beyond a reasonable doubt that R.L.P. met all the criteria for involuntary commitment under KRS 202C.050 and ordered him to be committed. This appeal followed.

## II. ANALYSIS

R.L.P. presents three categories of arguments on appeal. First, he contends KRS Chapter 202C unconstitutionally violates the due process rights of mentally ill persons. Second, he argues HB 310, which created KRS Chapter 202C, was unconstitutionally adopted by the General Assembly. Third, and finally, R.L.P. contends the trial court erroneously permitted the Commonwealth's experts to testify to hearsay without the proper foundation. We consider each argument in turn below.

In his first argument, R.L.P. argues that KRS Chapter 202C is unconstitutional, asserting that it violates due process for the mentally ill. "In reviewing 'the constitutionality of a statute,' we apply a *de novo* standard of review." *S.W. v. S.W.M.*, 647 S.W.3d 866, 873 (Ky. App. 2022) (quoting *Teco/Perry County Coal v. Feltner*, 582 S.W.3d 42, 45 (Ky. 2019)). He has broken this argument into subparts, the first of which is his assertion that KRS Chapter 202C violates due process by permitting an element of commitment, the initial evidentiary hearing, to be decided by a preponderance of the evidence and

without a jury. Citing *Addington v. Texas*, 441 U.S. 418, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979), R.L.P. acknowledges that the federal standard of proof for civil commitment is only clear and convincing evidence, but he also points to *Addington*'s recognition that states such as Kentucky may elect to use the higher standard of beyond a reasonable doubt. *Id*., 441 U.S. at 431, n.5, 99 S. Ct. at 1812 (citing *Denton v. Commonwealth*, 383 S.W.2d 681 (Ky. 1964)).

R.L.P. asserts that the trial court incorrectly viewed the evidentiary hearing as merely preliminary, rather than as establishing an element of a bifurcated process. R.L.P. points to *Dixon v. Commonwealth*, 263 S.W.3d 583, 589 (Ky. 2008), for the proposition that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. Ed. 2d 435 (2000)). In essence, R.L.P. asserts the KRS Chapter 202C evidentiary hearing is constitutionally infirm because it establishes an element, *i.e.*, guilt of a qualifying offense, without a jury and using only a preponderance of the evidence standard.

The Commonwealth responds by asserting that the trial court correctly determined KRS Chapter 202C was a civil commitment, not a criminal prosecution, and "the evidentiary hearing on 'guilt' in KRS 202C.030 is simply the

threshold, or screening mechanism, for proceeding to the actual commitment hearing." (Commonwealth's Brief at 13.) After some consideration, we agree with the Commonwealth and the trial court on this issue. The procedure in KRS Chapter 202C appears to be patterned closely after the involuntary commitment procedure in KRS Chapter 202A, which requires the judge to conduct a preliminary hearing in order "to determine if there is probable cause to believe the person should be involuntarily hospitalized." KRS 202A.051(6)(a). Following this initial determination, the trial court must then hold a final hearing to determine whether the respondent should be involuntarily hospitalized. KRS 202A.051(9). The final hearing under KRS Chapter 202A, like KRS Chapter 202C, requires "[t]he manner of proceeding and rules of evidence shall be the same as those in any criminal proceeding including the burden of proof beyond a reasonable doubt." KRS 202A.076. Both KRS Chapter 202A and KRS Chapter 202C also allow the respondent to request a jury for the final hearing. *Compare* KRS 202A.076(2) *with* KRS 202C.040(4).

R.L.P. complains that KRS Chapter 202C's initial hearing requires only preponderance of the evidence, yet preponderance of the evidence is a higher standard than probable cause, which is sufficient under KRS Chapter 202A. *Baker v. Commonwealth*, 475 S.W.3d 633, 634-35 (Ky. App. 2015) (citing *United States v. Arvizu*, 534 U.S. 266, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)). In short, the

preponderance of the evidence hearing in KRS Chapter 202C serves the same function as the probable cause hearing in KRS Chapter 202A, and the KRS Chapter 202C hearing appears to be even more protective of the respondent, as it requires a higher level of proof. Both KRS Chapter 202A and KRS Chapter 202C use an initial threshold hearing with a lower standard before arriving at the final adjudication hearing, which then requires a finding of all criteria for commitment beyond a reasonable doubt. If KRS Chapter 202A is constitutional in this aspect, then KRS Chapter 202C must be constitutional as well.

Furthermore, the language of two provisions found in KRS 202C.030 indirectly contradicts R.L.P.'s contention that KRS Chapter 202C is a criminal proceeding. KRS 202C.030(2) states, "A stipulation of potential guilt cannot be used against the respondent in any future criminal prosecution or civil litigation." In the same vein, KRS 202C.030(7) states, "No evidence or statement submitted by the respondent at the evidentiary hearing shall be admissible in any criminal prosecution or civil litigation." These provisions allow for the possibility of a future criminal prosecution, which implies that KRS Chapter 202C is not criminal itself. *See Kansas v. Hendricks*, 521 U.S. 346, 368-69, 117 S. Ct. 2072, 2085, 138 L. Ed. 2d 501 (1997) (recognizing that the state's involuntary commitment of dangerous individuals suffering from mental impairment is not punitive, and thus not a criminal proceeding).

As an aside, we sympathize with the trial court's evident frustration that the General Assembly chose to use the term "guilty," relating to the qualifying offense, in the context of a civil commitment proceeding. A recently published opinion by our Court notes the "peculiar" nature of a "guilt" hearing that is not "beyond a reasonable doubt." *See H.M. v. Commonwealth*, Nos. 2022-CA-1016-MR, 2022-CA-1195-MR, AND 2022-CA-1196-MR, 2024 WL 1122572 (Ky. App. Mar. 15, 2024).[3] *See also G.P. v. Bisig*, 655 S.W.3d 128, 129 (Ky. 2022). The use of "guilty" in an other-than-criminal context appears to be unnecessarily confusing. However, purely as an academic matter, we would note that not all "guilty" determinations happen in a criminal prosecution. "Prison disciplinary proceedings are not criminal prosecutions[,]" they "are civil, administrative actions[,]" yet inmates may be found "guilty" of violations. *Wilson v. Haney*, 430 S.W.3d 254, 257 (Ky. App. 2014). Nonetheless, much of the confusion around this issue may have been avoided if the General Assembly had avoided the term "guilt" or "guilty" and simply used the evidentiary hearing to determine if the respondent was "responsible for the qualifying offense by a preponderance of the evidence" or some similar phrasing.

---

[3] On December 12, 2024, the Kentucky Supreme Court granted discretionary review of *H.M. v. Commonwealth*, and the case is not yet final. As a result, the case is designated "not to be published" by operation of Kentucky Rule of Appellate Procedure ("RAP") 40(D)(2). We do not cite to *H.M.* as authority, but only to illustrate this point of law.

Finally, R.L.P. asserts KRS Chapter 202C violates due process because he argues it creates a more restrictive commitment reserved only for those found incompetent. He admits, however, that he did not present this argument to the trial court and asks us to review for palpable error under RCr[4] 10.26.[5] We decline. "To qualify as palpable error . . . an error must be easily perceptible, plain, obvious and readily noticeable. . . . Implicit in the concept of palpable error correction is that the error is so obvious that the trial court was remiss in failing to act upon it *sua sponte*." *Nami Resources Company, L.L.C. v. Asher Land and Mineral, Ltd.*, 554 S.W.3d 323, 338 (Ky. 2018). The trial court in this case was in no way remiss and considered all arguments brought by the appellant very thoroughly. Reversing the trial court based on an argument that was never previously raised on a novel constitutional question would not be appropriate here. "The Court of Appeals is without authority to review issues not raised in or decided by the trial court." *Regional Jail Authority v. Tackett*, 770 S.W.2d 225, 228 (Ky. 1989).

---

[4] Kentucky Rule of Criminal Procedure.

[5] As a technical matter, the proper rule for palpable error review in a civil proceeding should be Kentucky Rule of Civil Procedure ("CR") 61.02, not RCr 10.26. However, "[t]he language of CR 61.02 is identical to its criminal law counterpart, RCr 10.26, and we interpret that language identically." *Nami Resources Company, L.L.C. v. Asher Land and Mineral, Ltd.*, 554 S.W.3d 323, 338 (Ky. 2018).

-14-

In his second overarching issue on appeal, R.L.P. asserts HB 310 was unconstitutionally adopted because its passage in the General Assembly did not comply with Sections 46 and 51 of the Kentucky Constitution. Section 46 requires every bill to be read "at length on three different days in each House, but the second and third readings may be dispensed with by a majority of all the members elected to the House in which the bill is pending." "This is commonly referred to as the 'three-reading requirement.'" (R. at 74.) For its part, Section 51 states that "[n]o law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title[.]" Again, we review both constitutional issues *de novo*. *S.W.M.*, 647 S.W.3d at 873.

HB 310 began with the title "An Act relating to victims of sex offenses," and it was read three times under that title. (R. at 75.) After these readings, the General Assembly adopted floor amendments for the bill, one of which added language creating KRS Chapter 202C. The General Assembly then changed the title to "An Act relating to crimes and punishments and declaring an emergency." (R. at 75.) R.L.P. argues that the changes were so substantial that the General Assembly should have re-read the bill another three times. The Commonwealth maintains that the new language and title were in keeping with the theme of the original bill and only expanded the category from "victims of sex offenses" to crimes generally. (Commonwealth's Brief at 10.)

-15-

R.L.P. relies heavily on the Kentucky Supreme Court's decision in *Bevin v. Commonwealth ex rel. Beshear*, 563 S.W.3d 74 (Ky. 2018). That case revolved around an eleven-page bill, SB 151, with the title "An Act relating to the local provision of wastewater services." However, when the bill was sent to the House, the entirety of the eleven pages were stripped out and "replaced . . . with 291 pages of text addressing pension reform[.]" *Id.* at 79. As the Supreme Court summarized it,

> [Senate Bill ("SB")] 151 with its original wastewater services title and text was "read" twice in the House before the introduction of the Committee Substitute that removed and replaced all its text but left the title intact. Thereafter, the House again "read" SB 151 by its title as a wastewater services bill but with the substantive text of a pension reform bill. Appellants assert that this final reading of the bill by its title provided the third-reading required by § 46. The House voted to pass SB 151 by a vote of 49 to 46 with five members abstaining. After the voting was completed, the title of SB 151 was then amended to identify it as a measure relating to retirement and public pensions, thus, complying with the subject-title match requirement of Section 51 of the Kentucky Constitution.
> During its course through the legislative process, SB 151 received three readings in the Senate as a bill, in substance and title, pertaining to local wastewater services. In the House, it received two readings as a bill, in substance and title, pertaining to local wastewater services, and then it received a final "reading" in the House, still designated by title as a bill pertaining to local wastewater service but with the [*sic*] its textual content relating exclusively to public pension reform. Consequently, SB 151 was never "read" in either

chamber by its title as an act relating to retirement and public pensions.

*Id.* at 80. The Kentucky Supreme Court ultimately held that the enactment of SB 151 failed to comply with Section 46 and declared the enactment "void and of no effect." *Id.* at 94.

R.L.P. compares the passage of HB 310 to the situation addressed by the Supreme Court in *Bevin* and urges us likewise to hold its enactment void. However, we agree with the trial court that there are significant factual differences between HB 310's passage and SB 151's passage in *Bevin*. The trial court performed a thoughtful analysis in its order in which it contrasted the two scenarios:

> Here, instead of completely replacing the content of a bill, the legislature retained the original bill, but nonetheless added a substantial amount of text. It went from a 9-page bill containing 4 sections to a 28-page bill containing 24 sections. Moreover, the general tenor of the bill remained consistent. Although the original bill was targeted at reforming various criminal statutes related to sex offenses, the legislation maintained a consistent theme of addressing issues of criminal law and order. Most importantly, in the case of HB 310, the bill was read at least once with the proper title and accompanying amendments: after which it received unanimous approval in the House (compare to Bevin's SB 151 vote of 49 to 46 with abstentions). Unlike the controversy in Bevin, where there was an obvious attempt to by-step the requirements of KY. CONST. §46, here it seems the legislature was acting in a concerted effort to address what they believed to be an imminent crisis. It is, therefore, the opinion of this Court that the

-17-

> legislature did not violate KY. CONST. §46 in the passage of HB 310.

(R. at 76.)

In addition to the factual analysis provided by the trial court, we would add that *Bevin* itself states, "[L]egislators may amend the text of a bill between its readings without running afoul of §46. Ordinarily, the revised text is some variation of the original text and remains consistent with the theme reflected in the title of the bill." *Bevin*, 563 S.W.3d at 91. In collecting examples from sister jurisdictions reflecting this perspective, the Kentucky Supreme Court quoted with approval *Florida v. Hocker*, 36 Fla. 358, 18 So. 767, 770 (1895), for the proposition that "three re-readings are unnecessary when the amendments in question are 'made germane to the bill's general subject, either to the body of the bill or to its title." *Id.* at 92. Based on these considerations, we agree with the trial court that HB 310 complied with Section 46 despite being amended, so long as the title was "germane to the bill's general subject."

This, naturally, brings us to R.L.P.'s next related argument, which is that HB 310 did not comply with the Kentucky Constitution's mandate in Section 51 that "[n]o law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title." R.L.P. argues KRS Chapter 202C, a civil commitment procedure, is not germane to "An Act relating to crimes and punishments and declaring an emergency," which was HB 310's amended title.

-18-

(Appellant's Brief at 28.)  However, the Commonwealth correctly points out that "this provision vests the General Assembly with considerable leeway." (Commonwealth's Brief at 11.)  It is enough that the bill provides "general notification of the general subject of the act." *Martinez v. Commonwealth*, 72 S.W.3d 581, 584 (Ky. 2002).

The trial court agreed with the Commonwealth and in its order relied upon *Yeoman v. Commonwealth, Health Policy Board*, 983 S.W.2d 459 (Ky. 1998):  "The purpose of § 51 is to prevent this mislabeling of legislation so as to mislead.  Unless the title of an act is wholly inaccurate so as to actually deceive, it will be held to be constitutional under § 51 of the Kentucky Constitution."  (R. at 77) (quoting *Yeoman*, 983 S.W.2d at 476).  HB 310's amended title was general in its scope, such that it adequately encompassed KRS Chapter 202C, which addresses the issue of individuals who cannot be prosecuted for qualifying criminal offenses due to mental illness.  Based on these principles, we hold HB 310 did not violate either Section 46 or Section 51 of the Kentucky Constitution and the resulting enactment of KRS Chapter 202C was likewise constitutional.

For his third and final issue on appeal, R.L.P. contends the trial court erroneously allowed the Commonwealth's medical experts to submit reports containing hearsay.  "An appellate court's standard of review for admission of evidence is whether the trial court abused its discretion." *Stephens v.*

*Commonwealth*, 680 S.W.3d 887, 898 (Ky. 2023) (quoting *Brewer v. Commonwealth*, 206 S.W.3d 313, 320 (Ky. 2006)). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* (quoting *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999)).

During R.L.P.'s commitment hearing, Dr. Lesch and Dr. Hackman both submitted reports containing risk assessments which were performed by other staff members at KCPC.[6] First, R.L.P. asserts that both reports quoted from "Psy.D. Jaclyn Williams' report on her administration of the Historical Clinical and Risk Management, Version 3 (HCR-20, V3), risk assessment instrument." (Appellant's Brief at 30.) The second risk assessment tool was performed by Ron Jackson, a certified social worker, "who administered the Level of Care Utilization System, or LOCUS, a tool 'designed by the American Association of Community Psychiatrists (2009) to assist staff who work in psychiatric hospitalization settings to determine the most appropriate level of care[.]'" (Appellant's Brief at 31.)

---

[6] The Commonwealth has pointed out that R.L.P. did not specifically object to Dr. Lesch's reliance on the LOCUS assessment, nor did he object to Dr. Hackman's reliance on either assessment. R.L.P. does not dispute this contention in his reply brief, nor did he ask for palpable error review. However, it is our view that R.L.P. likely understood the trial court's overruling of his objection on the sole preserved issue of Dr. Lesch and the HCR-20 as covering the doctors' usage of both tools. Because we ultimately affirm the trial court, the question of preservation is immaterial here.

During the hearing, R.L.P. objected to Dr. Lesch's testimony regarding the risk assessment tools, arguing "he's testifying to a risk assessment tool that another doctor did." (Appellant's Brief at 31.) The trial court stated its belief that the testimony would be admissible under KRE[7] 703, "if they are of the type reasonably relied upon by psychiatrists in doing forensic examinations in these cases." (Appellant's Brief at 31.) Dr. Lesch confirmed he was not trained to administer the tools himself, but he has used them "many times" in risk assessments, comparing them to a stroke doctor using a magnetic resonance imaging ("MRI") in an evaluation, even though he is not trained to administer an MRI. The trial court thereafter permitted both doctors to refer to the assessment tools in their testimonies.

"[KRE 703(a)], in relevant part, embodies the well-established rule that experts are permitted to base their opinions on facts and data that are not otherwise admissible in evidence, if they are of a type reasonably relied upon by other experts in their field." *Exantus v. Commonwealth*, 612 S.W.3d 871, 899 (Ky. 2020). Both Dr. Lesch and Dr. Hackman explained that experts in their field rely upon HCR-20 and LOCUS assessments to assist in forming their opinions, and the trial court did not err when it ruled to admit the evidence under KRE 703(a). Moreover, the Commonwealth accurately asserts that the doctors did not solely

---

[7] Kentucky Rule of Evidence.

-21-

rely upon these assessment tools, but also used other sources of information, including their interviews with R.L.P. and R.L.P.'s previous hospital records, in order to develop their opinions. Even if the doctors' testimonies about the risk assessments were admitted in error, the remainder of their testimonies and other evidence in the record contains substantial evidence showing R.L.P. meets the criteria for involuntary commitment under KRS 202C.050.

### III. CONCLUSION

For the foregoing reasons, we hold the provisions of KRS Chapter 202C to be constitutional and affirm the trial court's order of involuntary and indefinite commitment for R.L.P. under KRS Chapter 202C.

ALL CONCUR.

BRIEFS AND ORAL ARGUMENT
FOR APPELLANT:

Timothy G. Arnold
Frankfort, Kentucky

BRIEF FOR APPELLEES:

Russell Coleman
Attorney General of Kentucky

Matthew F. Kuhn
Solicitor General
Frankfort, Kentucky

Sarah N. Christensen
Assistant Solicitor General
Frankfort, Kentucky

ORAL ARGUMENT FOR
APPELLEES:

Elizabeth Hedges
Assistant Solicitor General
Frankfort, Kentucky